BUXTON v. EMERY.

1. WILLS—CONTEST—UNDUE INFLUENCE.
   Evidence on a will contest examined, and *held*, sufficient to re-
   quire submission of the question of undue influence to the
   jury.

2. SAME—MENTAL CAPACITY—BURDEN OF PROOF.
   The burden of proving mental capacity to make a will is on
   the proponent, and it is error not to so charge.

3. SAME—INSTRUCTIONS.
   Instructions as to mental capacity examined, and *held*, erro-
   neous as placing the burden of proving its lack on contestant.

4. SAME—EXPERT EVIDENCE.
   Where, in a will contest, it is claimed that testatrix was a
   victim of the morphine habit, evidence that she exhibited
   symptoms indicating such habit is admissible to enable phy-
   sicians to give expert evidence on the subject.

5. SAME—INSTRUCTIONS.
   Instructions on the use of expert testimony examined, and
   *held*, argumentative and open to criticism as containing a
   protest against established rules of evidence.

Error to Wayne; Frazer, J. Submitted October 5,
1904. (Docket No. 4.) Decided March 21, 1905.

Benjamin W. Buxton presented for probate the last
will and testament of Jennie E. Buxton, deceased. The
will was allowed in the probate court, and Ralph Emery,
guardian of Robert T. Emery, appealed to the circuit
court. There was judgment at the circuit for proponent,
and contestant brings error. Reversed.

*McDonald & Fowler*, for contestant.

*Miller, Smith, Alexander & Paddock*, for proponent.

MONTGOMERY, J. This is a contest over the will of
Jennie E. Buxton, deceased. From a verdict and judg-
ment admitting the will to probate, the contestant, Emery,
brings error.

The record is of great length, and contains 90 assignments of error. Many of these assignments must be passed upon without discussion, unless we start out to publish a volume for the report of this case. We are not possessed of this purpose, and will therefore confine our discussion to what we consider the salient features of the case.

The grounds of contest were the usual ones of mental incompetency and undue influence. The testator was a woman of refinement, but had in the later years of her life become a victim of the drinking habit. Without setting out at length the testimony, differing somewhat as to the extent of her drinking, it is enough to say that there is abundant proof from which the jury might have found that she drank whisky habitually, and often to excess, and that there was testimony from experts tending to show that this habit had so affected her mentality as to render her incompetent. These deductions of the experts were, however, sharply controverted.

Mrs. Buxton's immediate relatives were her son, the proponent, Benjamin W. Buxton, and the contestant's ward, Robert T. Emery, a grandson of Mrs. Buxton, 10 years of age. Both were members of Mrs. Buxton's household. The son was married, and, with his wife, boarded with the mother. Robert's mother had died shortly after his birth, and he had lived with his grandmother from his birth until after the will in question was made. She was very fond of him, as all the testimony shows.

Benjamin W. Buxton had an estate from his father, although it was claimed on the trial that some portion thereof had not been paid over to him by his mother. Robert's mother had a like estate, and at her death left an estate of something like $30,000, about $22,000 of which was by Ralph Emery allowed to pass into the hands of Robert's guardian, as constituting Robert's estate. There were no others who had a special claim upon the bounty of deceased.

The relations between Ralph Emery and deceased

were not cordial. At the time of Mrs. Emery's death, quite a large number of articles of jewelry, toilet articles, dresses, ornaments, etc., were left in Mrs. Buxton's possession, and not inventoried by Robert's guardian. In October, 1900, Mr. Pendleton, who had up to that date acted as Robert's guardian, resigned, and Mr. Ralph Emery was appointed in his place. At this time, and for some time prior thereto, Mr. Alexander represented Mrs. Buxton as her attorney. Mr. Ralph Emery approached Mr. Alexander, presented a list of the articles belonging to the estate of his wife which had not been turned over to Robert's guardian, and asked to have the list verified and the property accounted for. This demand came to Mrs. Buxton as a surprise, as we judge from the record. Mrs. Buxton is shown to have claimed that the property of right belonged to her. It is also shown that some of the property had been disposed of, and that she declined to account for it.

Mr. Ralph Emery testified that, after this claim had been made to him, Mrs. Buxton had an interview with him as follows:

"She said she wanted to talk with me. After passing some general remarks, she said: ' We have had our difficulties, and we have not been the best of friends, but I hope from now on we can be. You know I am getting old and feeble, and Robbie is about all I have in this world for comfort; and,' she said, ' for God's sake, don't take him away from me. He is everything to me, and when I die he shall have one-half of my property.'

" *Q.* What did you reply to that statement ?

"*A.* I told her I didn't have any intention at that time of taking him away."

Mrs. Buxton died March 16, 1902, leaving an estate of about $50,000. The will in question was made on January 23, 1902, and, by its terms, bequeathes the entire estate to her son, Benjamin, entirely excluding Robert Emery from any participation. Mrs. Buxton was about 70 years of age at the time of her death. At the conclusion of the testimony the circuit judge withdrew the question of undue influence from the jury. The question of mental

competency was submitted to the jury under instructions to which reference will be made hereafter.

1. It is contended that the court was in error in withdrawing the question of undue influence from the jury. It is conceded that there is no direct evidence of any influence exerted by or on behalf of Benjamin, but the contention is that the circumstances tend to show that undue influence was exerted by Mr. Alexander. In counsel's brief it is asserted that Mr. Alexander testified that he told Mrs. Buxton that Mr. Emery had threatened to drag her into court and to show that she was a drunkard; and, as Emery testified that he did not make this threat, it became a question for the jury as to whether this alleged untruthful statement to Mrs. Buxton was not made to cause or increase a prejudice against Ralph Emery, and thus indirectly prejudice her against the idea of leaving any sum to Robert. An examination of the record leaves some doubt as to whether the witness Alexander intended to be understood that the fact of this threat was communicated to Mrs. Buxton; but we are of the opinion that his testimony was susceptible to that construction by the jury, and that, if the fact should be so found, it would have some tendency to prove undue influence, when considered in connection with the fact that Mrs. Buxton assigned as one of her reasons for making the will in the terms which she adopted a want of confidence in Ralph Emery, and the further fact that no suggestion was made to her that the interests of Robert in any bequest might be protected against the imprudence or dishonesty of his father by the appointment of a trustee.

2. There was error in refusing contestant's request to charge that the burden of proof on the question of mental capacity was with the proponent. Contestant was clearly entitled to such a charge, or its equivalent. *Prentis* v. *Bates*, 93 Mich. 234 (17 L. R. A. 494). It is contended by proponent's counsel that the main charge of the court did, in effect, cast the burden of proof on the proponent, and that the jury must have so understood it. We do

not so read the record.   The court put the case to the jury
as turning upon the question whether the testator was or
was not of sufficient mental capacity to execute the will,
and also charged as follows:

"Bear in mind all the time, gentlemen of the jury, if the
evidence in the case is satisfactory to you—to show you that
there was lack of mental capacity to execute the paper at the
time—then, whether the reasons are good or bad to you, the
paper must fall for lack of this mental power.   So you see,
gentlemen of the jury, reason as you will, pursue what-
ever path you may see fit to follow, they all lead you back
to this one, main, central proposition involved in this con-
troversy—whether or not this testatrix, at the time this will
was executed, had sufficient mind, under the rules that I
have laid down to you, or, rather, sufficient mental capac-
ity, to execute the paper presented here as her last will and
testament."

This instruction implies that the burden rests upon the
contestant rather than upon proponent.   It certainly does
not effect the purpose aimed at by the request, and no-
where in the charge is the rule given to the jury.

3. The contestant sought to show that the testator was
a victim of the morphine habit.   No direct evidence was
adduced to show the fact, but it was sought to show the
main fact, as we gather from the record, by showing that
the symptoms exhibited by Mrs. Buxton indicated this
habit; and complaint is made of a remark or ruling of the
court that "you cannot prove that the woman took mor-
phine by somebody else's opinion."   Without reviewing
the specific rulings upon offers of testimony, we content
ourselves with holding, in view of the necessity for a new
trial, that it may become a matter for expert medical opin-
ion as to whether the symptoms exhibited by one addicted
to this habit are such as to enable a physician to judge of
the fact.   If they are, it follows that, as this habit is usu-
ally a secret one, such testimony might furnish the only
means of proving the fact.

4. The circuit judge charged the jury upon the subject
of expert testimony, and, after cautioning them as to the

necessity of an opinion resting upon the foundation of fact, and illustrating his point by appropriate illustrations, added:

"I make these illustrations only for the purpose of showing the difficulties that surround people who are undertaking to give opinions upon what other people say, based upon a hypothetical question supposed to contain all the facts that are germane to the issue. It is upon that uncertain foundation that all the experts in this case have been allowed to express their opinion. I permitted it in here. I permitted these people to give this testimony, and I want to say here, and say it frankly, not because I think I ought to have done it, but because the law compels me to do it— You can give it, on both sides of this case, just exactly such weight as you see fit to give it, and no more. At best, the testimony of all these experts is but an opinion based upon supposed facts stated by witnesses, first filtered through the witness, then through the lawyer, then through the expert, and then through the jury; and that is the kind of evidence upon which decisions are based upon such kind of testimony. Now, what the chances are of the conclusions drawn from that kind of testimony being correct, you can determine just as well as I can; but I submit this testimony to you, of these experts, telling you just exactly what it is, and how it is obtained, and what its strength is, and, without expressing any opinion as to whether they have formed correct opinions or not, I submit it to you, as the judges of the weight of this testimony, with these instructions, for your determination."

This charge is argumentative, and is open to just criticism in so far as it contains a protest against established rules of evidence. We need not determine whether the later portion of the charge was calculated to correct the impressions given to the jury by the earlier, as on a new trial the question is unlikely to arise in this form.

No other questions seem to call for special mention.

The judgment is reversed, and a new trial ordered.

MOORE, C. J., and CARPENTER, GRANT, and HOOKER, JJ., concurred.